**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

AMANDA BETH WEDWICK,

       Plaintiff,

v.                                           ACTION NO. 2:14cv267

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.


**UNITED STATES MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION**

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated August 14, 2014. ECF No. 6. This Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) and Motion to Remand (ECF No. 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED, and that the decision of the Commissioner be VACATED and REMANDED.

## I. <u>PROCEDURAL BACKGROUND</u>

Plaintiff, Amanda Beth Wedwick, filed an application for Social Security Disability Benefits ("SSD") on December 16, 2011, alleging she had been disabled since April 15, 2007. R. 59, 118-119.[1] The application stemmed from fibromyalgia. R. 59.

The Commissioner denied Plaintiff's application on March 20, 2012, and upon reconsideration on September 26, 2012. R. 81-85, 88-92. At Plaintiff's request, a hearing before Administrative Law Judge ("ALJ") Irving Pianin took place on November 14, 2013 where both Plaintiff, who was represented by counsel, and an impartial vocational expert (VE) testified.  R. 38-58.

The ALJ released an opinion on November 20, 2013, finding that Plaintiff was not disabled, and denying her claim. R. 19-37. Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 4, 2014, the Appeals Council denied her request for review of the ALJ's decision. R. 1-7.

The ALJ's decision therefore stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Having exhausted all administrative remedies, Plaintiff filed a complaint with this Court on June 4, 2014 (ECF No. 1), and Defendant answered on August 12, 2014 (ECF No. 4). Plaintiff submitted a Motion for Summary Judgment (ECF No. 10), a Motion for Remand (ECF No. 11) and a Memorandum in Support (ECF No. 12) on September 26, 2014. Defendant filed a Motion for Summary Judgment (ECF No. 13) and Memorandum in Support (ECF No. 14) on October 31, 2014. Plaintiff filed a reply brief on November 17, 2014. ECF No. 15.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

On April 17, 2014, this Court ordered Defendants to file a position setting forth whether *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) warrants remand in this case. ECF No. 16. Defendant filed a Memorandum in Response on May 1, 2015 (ECF No. 17, "Defendant's Mascio Memo"), and Plaintiff filed a Response to Memorandum on May 7, 2015 (ECF No. 18 "Plaintiff's Mascio Response"). Defendant then filed a Reply to Plaintiff's Response to Order on May 14, 2015. ECF No. 19 ("Defendant's Mascio Reply").

 As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. <u>FACTUAL BACKGROUND</u>

Plaintiff was born in 1975 and was thirty-one years old at the date of the alleged disability. R. 118. Plaintiff has a college education, and has worked as an accountant and bank teller. R. 42, 55.

### A. Plaintiff's Medical History

#### (1) May Medical Group

Plaintiff was treated from January 2006 to August 2010 at May Medical Group in Munford, Tennessee. R. 250-326. On January 24, 2006, Plaintiff was assessed with mild depression. R. 293. On February 4, 2006, Plaintiff was seen for a follow-up on her depression, and assessed with fibromyalgia. R. 292.

On February 1, 2007, she reported pain and swelling in her left foot, and was diagnosed with left ankle/foot strain, and plantar fasciitis that was slowly improving. R. 279. On May 8, 2007, Plaintiff was prescribed Flexeril. R. 278.

On February 26, 2008, Plaintiff was prescribed Lyrica, Soma, Restoril, and Cipro. R. 276. On September 4, 2008, Plaintiff, who was pregnant also reported right ankle pain. R. 274.

On June 17, 2009, Plaintiff was prescribed Elavil (R. 270), but on July 15, 2009, she said that her medications were not working well, and that she had pain all over. R. 267. On October 7, 2009, Plaintiff was diagnosed with postpartum depression and prescribed Zoloft. R. 265. When she continued to report symptoms of depression and fatigue on October 21, 2009, her dose of Zoloft was increased. R. 264. On November 20, 2009, it was noted that Plaintiff "still" had abdominal pain and bloating, but had been attending physical therapy for hip and back pain. R. 263.

On January 6, 2010, when Plaintiff was seen at a follow-up appointment, she had a low mood and affect and reported that "nothing worked" and "everything hurt." R. 262. She was sent for a consult with Mays and Schnapp Pain Clinic for her fibromyalgia, and sent for an oral surgeon consult for her Bruxism (teeth grinding) and TMJ (temoporomandibular joint dysfunction). R. 262.

On January 28, 2010, Dr. Schnapp was working with Plaintiff for her ongoing pain problems, and Lyrica and Soma were discontinued. R. 261. On March 25, 2010, Plaintiff reported continuing to struggle with chronic pain (R. 260), and on April 14, 2010, she was diagnosed with neuropathy (R. 258). On June 9, 2010, Plaintiff was diagnosed with left wrist and thumb strain, brachial plexitis, cervical radiculopathy, and myofascial pain. R. 257. In August 2010, Plaintiff reported taking her medicine regularly, but continued waking up in pain each morning. R. 255. She also reported that she was moving to San Diego. *Id.*

### (2) Mays and Schnapp Pain Clinic and Rehabilitation Center

Plaintiff was seen by Moacir Schnapp, M.D., starting January 26, 2010, when she received an MRI of her cervical spine. The MRI showed mild diffuse posterior disc bulges at C4-C5 and C5-C6. R. 248.

On February 3, 2010, Plaintiff was seen for "bilateral neck, shoulder, and upper extremity pain" as well as "bilateral upper and lower extremity tingling." R. 244. Dr. Schnapp's examination of Plaintiff showed stiffness with walking, a positive Hoffman bilaterally, good coordination and no weakness. *Id.* Dr. Schnapp diagnosed Plaintiff with myofascial pain and B12 deficiency, and noted that the MRI of her cervical spine was negative for myelopathy. *Id.*

On March 25, 2010, Plaintiff reported continuing aching, burning, and tingling in her hands and lower extremities, but had improved energy since stopping Zoloft. R. 241. Dr. Schnapp reported that she was "clearly overwhelmed" and had a persistent component of depression and anxiety, but denied overt depression. *Id.* He prescribed Neurontin. *Id.*

On April 1, 2010, Plaintiff underwent an Electromyography (EMG) and Nerve Conduction Study (NCS), which revealed "evidence of radiculopathy, predominantly involving the C6 level, with some involvement of C5," and no evidence of compressive neuropathy. R. 238-40.

On April 13, 2010, Dr. Schnapp noted Plaintiff's complaints of persistent bilateral upper extremity pain, increased symptoms at night, and clumsiness. R. 235. The MRI of the cervical spine was essentially negative, and the EMG and nerve conduction studies showed what could be a left C5 radiculopathy. *Id.* Her deep tendon reflexes looked substantially improved, showing far less hyperactivity than previous visits. *Id.* Plaintiff appeared psychologically stable, without signs of depression or anxiety, but some slight degree of somatic preoccupation. *Id.* Dr. Schnapp's diagnosis included brachial plexitis, cervical radiculopathy, and myofascial pain, and Plaintiff agreed to proceed with a trial of a brachial block. *Id.*

On June 24, 2010, Plaintiff's pain and functioning were improved following a branch block, reducing her pain to 2/10. R. 230. She had some intolerance to heat, but could get up

without much difficulty, her strength was compatible with her muscle mass, and her deep tendon reflexes were symmetrical. *Id.* She was psychologically stable, without major depression or anxiety. *Id.*

On August 3, 2010, Plaintiff reported pain at 4/10, and that when she laid down on her back she experienced increased pain, numbness, and tingling that radiated from her neck into her arms, and that caused her to wake at night. R. 227. Dr. Schnapp's examination showed slightly brisk deep tendon reflexes in Plaintiff's knees, multiple trigger points around her trapezius that were "not a problem," and slightly decreased range of motion in the cervical spine for flexion and extension. *Id.* Dr. Schnapp did not believe her symptoms were likely related to fibromyalgia, but rather thought they were a component of myofascial pain, and that brachial plexopathy/radiculopathy syndrome existed. *Id.* He continued her medications, deferred additional nerve blocks, and added Klonopin. *Id.*

### (3) San Diego Arthritis Medical Clinic

On May 12, 2011, Puja Chitkara, M.D., performed a rheumatology consultation on Plaintiff. R. 416-18. Plaintiff reported that she had ongoing chronic musculoskeletal pains for the past seven years, and had seen many doctors—some doctors had told her that she had fibromyalgia, while other doctors disagreed. R. 417. She reported her symptoms to be fatigue, joint pain, tingling in the hands and feet, pain that radiated throughout her body, and difficulty performing daily activities. R. 416, 417. She said her pain was currently at 2/10, there was no morning stiffness, and her fatigue was mild. R. 416. Dr. Chitkara's examination found no tenderness or swelling of any joints, no trigger points noted, a full range of motion in the cervical and thoracic and lumbar spine with no discomfort, and full symmetrical muscle strength. R. 417. Dr. Chitkara's assessment was polyarthralgias and myalgias. *Id.*

### (4) Michael I. Keller M.D., Inc., and Associates

Dr. Oleg Gavrilyuk, M.D., a specialist in physical medicine and rehabilitation, treated Plaintiff since June 29, 2011, when he performed a consultative examination. R. 414-15. Plaintiff reported symptoms of a sleep disorder, fatigue, joint pains, and tingling in her hands and feet. R. 414. During her examination, Plaintiff had no tenderness or swelling of any joints, full range of motion in the cervical and thoracic and lumbar spine with no discomfort, and full symmetrical muscle strength. R. 415. Plaintiff had 12 out of 18 positive fibromyalgia tender points and Dr. Gavrilyuk diagnosed her with fibromyalgia and a sleep disorder R. 415. He recommended that she continue physical therapy, gradually taper off Klonopin, and begin Rozerem. *Id.*

On July 27, 2011, Plaintiff reported increased pain and muscle spasm in the right shoulder area, and Dr. Gavrilyuk administered a trigger point injection to her right trapezius. R. 411.

On August 11, 2011, Plaintiff had a Polysomnogram (sleep study) and was diagnosed with obstructive sleep apnea ("OSA"). R. 362-67. On August 14, 2011, she had a nocturnal polysomnogram with nasal CPAP titration that also showed obstructive sleep apnea. R. 355.

On September 21, 2011, Dr. Gavrilyuk prescribed Ambien for Plaintiff's sleep apnea (R. 403) and on September 30, 2011, he prescribed Nuvigil for her excessive daytime sleepiness (R. 399).

Dr. Gavrilyuk wrote a letter on October 13, 2011, in which he reported that Plaintiff had been diagnosed with fibromyalgia, and had "been tried on multiple medications including Cymbalta, Neurontin, Soma, and Klonopin without substantial relief, and [they] actually resulted in side effects." R. 328.  She had reported widespread pain for the last six or seven years, and had been diagnosed with sleep apnea and chronic musculoskeletal pain. R. 328. He concluded

that she had not shown signs of improvement and she did have "signs and symptoms of complete, temporary disability." *Id.*

On November 30, 2011, Plaintiff returned for reevaluation of neck/periscapular area pain and stiffness, as well as tingling in her hands and feet. R. 390, 429. Plaintiff reported pain in her right shoulder area, and periodic numbness in the fourth and fifth fingers of the right hand. R. 390, 429. She had been treated with Cymbalta, Neurontin, Soma, and Klonopin, which provided no sustainable improvement, and the Neurontin had caused significant weight gain. R. 390, 431. Dr. Gavrilyuk decreased Plaintiff's prescription for Nuvigil after recording that it had improved her fatigue, but caused the side effect of diarrhea. R. 390, 391, 429, 430. Dr. Gavrilyuk found a positive Adson sign on the right and 10/18 positive fibromyalgia tender points. R. 390, 431.

On January 11, 2012, Plaintiff had no tenderness or swelling of any joints, but reported neck and muscle pain, stiffness, and tingling in her hands. R. 386-87.

On February 8, 2012, Dr. Gavrilyuk made similar findings, but added Lyrica to Plaintiff's other medications. R. 383.

Dr. Gavrilyuk's findings in March 2012 were very similar, but Plaintiff reported increased numbness in her hands, and showed 9/18 positive fibromyalgia tender points. R. 378.

On April 10, 2012, Dr. Gavrilyuk completed a fibromyalgia questionnaire. R. 432-37. He found that Plaintiff met the American Rheumatological criteria for fibromyalgia, and diagnosed her with fatigue, sleep problems, and headaches. R. 433. Her primary symptoms were pain and decreased sensation. R. 434. Dr. Gavrilyuk assessed that in an eight-hour work day, Plaintiff could sit for one hour or less, stand or walk for one hour total, and would have to get up every fifteen minutes when sitting, and move around for twenty minutes before sitting down again. R. 435. He found that she could occasionally lift or carry up to ten pounds, but never any more than

8

that. *Id.* Dr. Gavrilyuk reported that Plaintiff was "incapable of even 'low stress' jobs," because stressful conditions increased her pain and fatigue. R. 435-35. He said that she would miss work more than three times per month as a result of her impairments or treatment, and that she was unable to work at the present time. R. 436-37.

On July 23, 2012, Dr. Gavrilyuk reported that a neurologist, Dr. Geoffrey Sheean, had diagnosed Plaintiff with small fiber neuropathy. R. 529. She continued to demonstrate 9 out of 18 positive fibromyalgia tender points, and also had mild tenderness in the coccyx. R. 530. Dr. Gavrilyuk diagnosed her with coccygodynia and increased her dose of Lyrica. *Id.*

On October 1, 2012, Dr. Gavrilyuk found 10/18 positive fibromyalgia tender points. R. 523. Plaintiff still had mild tenderness in the coccyx area, and Dr. Gavrilyuk also diagnosed her with Sjogren's syndrome and lumbar pain/right sacroiliac area pain. *Id.* He administered a trigger point injection to the right sacroiliac joint. R. 524.

On October 18, 2012, Mahmood Pazirandeh, M.D, a colleague of Dr. Gavrilyuk, provided a rheumatology consultation for Plaintiff. R. 519. He found a mildly decreased range of motion of the cervical, thoracic, and lumbar spine, with no discomfort. R. 520. Plaintiff reported that she could open jars, write legibly, turn door knobs, reach overhead and into her back pocket, put on socks, climb stairs, and walk long distances. R. 519. Dr. Pazirandeh diagnosed Plaintiff with: (1) peripheral neuropathy, though it was unusual to be mostly during the day; (2) sub-clinical connective tissue disease, including Sjogren and neuro Sjogren; and (3) possibly Celiac and or low-grade Crohn's disease. R. 521.

On October 31, 2012, Dr. Gavrilyuk administered a trigger point injection to Plaintiff's right knee. R. 513.

On November 12, 2012, Plaintiff saw Dr. Pazirandeh and reported pain to be at 7 out of

9

10. R. 506-09. Plaintiff was seen for a follow-up by Dr. Pazirandeh on December 3, 2012, and reported increased pain in the hands, arms, low back, knee, and scapular area. R. 500-03.

On December 31, 2012, Dr. Gavrilyuk administered another trigger point injection to Plaintiff's right knee. R. 513.

Plaintiff returned on February 28, 2013, with bicipital tendonitis and a tender rib, and Dr. Pazirandeh added Procardia and continued Plaquenil. R. 1016-20.

### (5) Geoffrey Sheean, M.D.

On April 15, 2012, Plaintiff went to Dr. Sheean for probable sensory polyneuropathy. R. 988-92. His examination showed impairment of pinprick sensation in her knees, normal joint position sense, pseudo-weakness of the great toes, and weakness in the upper limbs. R. 989. Dr. Scheean diagnosed Plaintiff with predominant "small fiber sensory polyneuropathy with possible bilateral carpal tunnel syndrome," possible sicca syndrome, and possible primary Sjogren's syndrome. *Id.*

Plaintiff underwent electrophysiology testing on May 14, 2012, and Dr. Sheean reported a small sensory fiber polyneuropathy. R. 988. She also was found to have a B6 deficiency, and an impaired glucose tolerance, which Dr. Sheean noted could be causing the polyneuropathy. R. 988. He also said that it "seems likely that she is depressed," and he "strongly recommended that she seek referral to a psychiatrist through her primary care doctor, emphasizing the mutually destructive and reinforcing relationship between depression and chronic neuropathic pain." *Id.*

On May 30, 2012, Plaintiff had an Evaluation at Psycare, Inc. R. 883-90. During the evaluation, Plaintiff reported that her symptoms had a significant effect on her energy levels/fatigue; "much effect" on her sleeping, loss of interest in activities, difficulty planning ahead, and mood changes; and "some effect" on her hopelessness, decreased attention span,

distractibility, and anxiety. R. 883. Her diagnosis was fibromyalgia, neuropathy, and B6, B12 deficiency. R. 888. It was noted that there was a need to rule out a mood disorder secondary to fibromyalgia. *Id.* She was assigned a GAF score of 55-60, and started on the anti-depressant Wellbutrin. R. 888-89. A progress note from June 8, 2012, showed that her sleep and energy level were better, and on June 29, 2012, her mood was much better. R. 71, 891, 892.

On July 27, 2012, Plaintiff underwent Quantitative Sensory Testing with Dr. Sheean, which revealed Plaintiff's heat-pain thresholds to be borderline abnormal in the feet but normal in the hands. R. 979. Her right-foot cold threshold was borderline abnormal but her left-foot and both hands were normal, and her left-hand vibration threshold was abnormally high, with her right-hand and both feet normal. R. 979.

On September 5, 2012, Plaintiff reported that she still had tingling in her hands and feet, muscle spasms all over her body, recent chest pain/palpitations, and gallstones. R. 978. She had lost 30 pounds in the last year, and her symptoms were somewhat better with B12 replacement. *Id.*

On November 17, 2012, Plaintiff reported painful cramps in her hands that lasted 5-10 seconds, cramps in her neck, shoulders, and feet, but that the cramps were not spontaneous. Her neuropathic pain was the same, and her fasciculations were worse. R. 977. She reported shaky hands, formication (sensation of insects crawling over the skin) (ECF No. 12 at 10) on her hands, feet, arms, and ankles, poor balance, pain in her right knee, and problems with word-finding, memory, and concentration. R. 977.

On January 16, 2013, Plaintiff stated that some of her symptoms—myalgia, arthralgia, fasciculations, cramps, and dry eyes—had improved with Plaquenil and Diclofenac, her neuropathic pain was unchanged. R. 975. She reported seeing a psychiatrist every two months,

but her condition was not desperate. *Id.* On that date Dr. Sheean also wrote a "to whom it may concern" letter stating that Plaintiff was receiving neurological care from him for "painful small fiber autoimmune polyneuropathy, as a complication of primary Sjogren's syndrome." R. 533.

Plaintiff returned on March 8, 2013 and had started to get arthralgia in her knees. She also had "several contraindications to steroids and immunosuppression." R. 971.

On May 29, 2013, Plaintiff reported myoclonic jerks of arms and legs, and that her symptoms were getting worse with the stress of her move. R. 970.

On May 29, 2013, Dr. Sheean wrote that Plaintiff "has primary Sjogren's syndrome (PSS) with rheumatological and neurological complications, the latter being a painful, small fibre [sic] polyneuropathy. Depression (possibly from Sjogren's encephalopathy) contraindicates steroids and Plaquenil has not helped her neuropathy. Therefore, IVIg (intravenous immunoglobulin therapy) is indicated and the literature below supports its use in PSS." R. 963.

### (6) Verdolin Pain Specialists

On December 11, 2012, Plaintiff began treatment with Verdolin Pain Specialists in San Diego. R. 943-44. She reported constant and moderate pain in her hands, shoulders, and feet, as well as tingling sensations during activity. R. 943. She described the pain as variously throbbing, burning, aching, hot, dull, shooting, and tingling. *Id.* Michael Verdolin, M.D., diagnosed polyneuropathy in collagen vascular disease, keratoconjunctivitis sicca, and chronic pain. R. 944. Plaintiff was started on Lyrica. R. 944.

On January 22, 2013, Plaintiff was diagnosed with opioid type dependence, continuous use, and Tramadol was added to her medications. R. 946, 947.

On February 18, 2013, Dr. Verdolin diagnosed Plaintiff with "reflex sympathetic dystrophy of the upper limb" and Raynaud's syndrome, and performed a right stellate ganglion

block. R. 949.

Plaintiff returned for follow-ups on February 19, 2013 (R. 951-52), March 19, 2013 (R. 953-54), March 22, 2013 (R. 955-57), May 8, 2013 (R. 961-62), and May 29, 2013 (R. 970-71). Her pain on May 8, 2013 was at 6/10, but these subsequent appointments otherwise revealed no significant change.

### (7) Portsmouth Naval Medical Center (NMC)

On July 16, 2013, Plaintiff began treatment at the Portsmouth Naval Medical Center, after moving from California to Virginia. R. 796. She had requested consults for her Sjogren's syndrome, and her history was described as:

> Muscle pain, dry eyes, dry mouth, joint pain, and was diagnosed in January with primary Sjogren's syndrome (PSS) with rheumatology and neurological complications, with the latter being painful, small fiber polyneuropathy (per her neurology physician Dr. Geoffrey Lyle Sheean), she has also had depression, myositis, and chronic low back pain for which she had seen a pain clinic for injections and possibly implanted EMSI. . . Patient had been seeing the Pain Clinic for injections for her hand/wrist & feet pain – she had nerve blocks done. . . Patient has been on twice/month vitamin B12 injections for anemia, pain, loss of energy.

R. 796.

On August 6, 2013, Plaintiff was seen in the Portsmouth rheumatology clinic by nurse practitioner Fredilynn P. Lansanga. R. 784. Plaintiff reported numerous symptoms:

> sicca symptoms, vaginal dryness, cavities, painful persistent parethesias to hands and feet, joint pain, Raynauds, palpitations, myalgias with "constant knots and spasms" in muscles, chills, night sweats, migraines, disorientation, unsteady gait, vision changes, insomnia, fatigue, pruritic skin without any rash or problems with dryness, loose stools after meals, easy bruising, and depression.

R. 784. She also reported "chronic joint pain to neck, shoulders, upper back, hips, hands, right knee, and feet without any joint swelling." *Id.* She denied morning joint stiffness, but had

stiffness to her muscles in the morning. *Id.* An examination showed tenderness to palpation in her left 2nd metacarpal and right 3rd metacarpal, strong bilateral grip, tenderness to palpation of the supraspinatus muscle, tenderness to palpation of the trapezius muscle, a muscle spasm at the trigger point of the cervical muscles, pain with cervical motion, but normal cervical spine motion, tenderness to palpation in both trochanters, and 10 out of 18 positive trigger points. R. 786. Plaintiff was diagnosed with Sjogren's syndrome, some "features of fibromyalgia," and continued on Plaquenil. R. 787.

On August 8, 2013, Octavian R. Adam, M.D, diagnosed Plaintiff with polyneuropathy, "paresthesia and vasomotor changes in distal extremities, consistent with small fiber polyneuropathy in the setting of Sjogren's disease," "bilateral high frequency low amplitude postural upper extremity tremor, likely essential tremor," and a non-active history of migraine headaches. R. 781, 783. Dr. Adam's examination of Plaintiff showed evidence of "bilateral upper extremity postural fast frequency tremor," and diminished sensation to temperature and vibration in her distal lower extremities. R. 782.

On August 19, 2013, Plaintiff was seen at the NMC Portsmouth Pain Management clinic by Thomas J. Moran, D.O., for polyneuropathy. R. 759. She reported pain in her joints, muscles, and upper back, and that it was worsened by heat and activity. R. 759.  She said that the pain was constant, either dull, sharp, burning, or stabbing, averaging at 6/10, with 4 at the best, and 8 at the worst. *Id.* An examination revealed positive trigger points bilaterally in the occipital muscle, trapezius muscle, greater trochanter, second costochondral junction, lateral epicondyle, and medial knees. R. 760. Decreased sensation to light touch was noted in the fingertips to metacarpal joints bilaterally, without allodynia or hyperpathia, and motor strength was intact in the upper extremities. Dr. Moran diagnosed Plaintiff with polyneuropathy, Sjogren's syndrome,

14

and generalized muscle aches, and was given a TENS unit. R. 760-761.

### (8) Non-examining State Agency Opinions

On September 24, 2012, a California state agency physician, Dr. Ormsby, reviewed the treatment evidence and considered Dr. Gavrilyuk's April 2012 opinion. R. 73. Dr. Ormsby did not accept Dr. Gavrilyuk's limitations, and assessed Plaintiff's residual functional capacity as limited to medium work, with occasional postural changes. R. 74-75. He thought Plaintiff was capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, frequently climbing stairs, occasionally climbing ladders, and frequently stooping, kneeling, crouching, and crawling. R. 74-75.

On September 25, 2012, a state agency psychologist, Peter Bradley, Ph.D., considered Plaintiff's treatment for depression. R. 71. He recommended that her impairment was non-severe, citing her June 2012 treatment notes, in which she said that she was "doing OK," that her pain was a little better, and her mood was "much better." R. 71, 892.

### B. Testimony Before the ALJ

Plaintiff testified before the ALJ that she had a college education, and previous work experience as an accountant and a financial analyst. R. 42-43. She stopped working in 2007 due to "having issues before her daughter was born" and being in "a lot of pain every day." *Id.* Plaintiff testified that she takes care of her four-year old and six-year old children, and that her husband is in the Navy. R. 42

She also reported that she is still unable to work, even apart from child care responsibilities, because she has difficulty sitting all day and was in a lot of pain. R. 44. She described this pain as "tingling pain" in her hands and feet on a constant basis that gets worse the more she does and as the day goes on, and that it "will turn into a burning pain that will go up

into [her] arms and into [her] shoulders." R. 44-45. She reported that touching certain surfaces such as jeans could be extremely painful, and touching anything that vibrates or has motion to it, like a steering wheel, also hurt. R. 53-54. She said she had difficulty balancing and she sometimes had muscle spasms and twitches throughout her body. R. 54.

Plaintiff said that she could probably lift and carry twenty pounds or less, and could sit for twenty to thirty minutes before adjusting position. R. 49. She estimated that she could stand for twenty to thirty minutes before sitting, and walk for about half a mile before she needed to stop and rest. *Id.*

Plaintiff said that she was able to cook, grocery shop, change the bed linens, sweep, vacuum, take out the trash, and unload the dishwasher. R. 49-50. She aided in bathing her children and helping them with homework, but claimed that they were "kind of self-sufficient now." R. 50. Plaintiff testified that she tried to spread her duties out so that she didn't do too much in one day, as that would render her unable to do anything the next day. R. 51. She also said that she had to takes "a lot of little breaks" throughout the day after doing small tasks, and that she also took an hour or two break in the middle of the day. R. 52

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

*Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file applications for DIB and SSI, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also*

42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." *Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008).  At all steps the ALJ bears the ultimate responsibility for weighing the evidence. *Hays*, 907 F.2d at 1456.

**A. ALJ's Decision**

On November 20, 2013, following the administrative hearing, the ALJ made the following findings with respect to Plaintiff. R. 19-37.  The ALJ found that Plaintiff was last insured on December 31, 2012, and she has not engaged in substantial gainful activity from her

alleged onset date, April 15, 2007, through that time. R. 24.

He found that she had the following severe impairments: "cervical radiculopathy; brachial plexitis; myofascial pain syndrome; fibromyalgia; neuropathy; and a mood disorder." R. 24. Her symptoms included neck pain, shoulder pain, generalized muscle pain, reduced sensation in her fingers, and depression, which significantly limited in her ability to lift, carry, and feel objects, and limited her ability to sustain concentration for the completion of complex or detailed tasks. R. 24.

Plaintiff had other alleged impairments, such as a history of obstructive sleep apnea, rhinitis and cholelithiasis. R. 329-373. The ALJ found, however, that these impairments were not severe because they did not exist for a continuous period of at least twelve months, responded to medication, and did not require significant treatment or result in continuous functional limitations. R. 25. Likewise, rheumatoid arthritis and Sjogren's syndrome were considered as diagnoses, but were not definitively diagnosed, and the ALJ found "no convincing evidence of Sjogren's syndrome resulting in significant functional limitations. . . ." R. 25.

The ALJ found that Plaintiff did not have an impairment that met or medically equaled the severity of listings in 20 CFR Part 404, Subpart P, Appendix 1. R. 25.

The ALJ found that Plaintiff had no restrictions in her activities of daily living based on her mood disorder: she took care of two small children, her personal needs, and performed most household chores. R. 26. He found that she had no difficulties in social functioning based on her mood disorder, as she interacted appropriately with her children, and had friends. R. 26. The ALJ found that her mood disorder caused Plaintiff moderate difficulty regarding concentration, persistence, or pace. It "interfered with her ability to sustain concentration for the completion of complex or detailed tasks, but she retained the ability to understand, remember and carry out

simple instructions and tasks." R. 26.

The ALJ found that Plaintiff did not meet the "paragraph B" or "Paragraph C" criteria of

listing 12.04. R. 26.

The ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that, through the date last insured, the claimant had the
> residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) except: the claimant could kneel, crouch, crawl,
> stoop and balance only occasionally, and could perform work
> activities that required no climbing. The claimant retained the
> ability to perform work activities that did not require more than
> occasional tactile/feeling in the fingertips for feeling objects. The
> claimant could perform only simple, routine and repetitive, 1 or 2
> step tasks due to limitations in concentration, persistence, or pace.

R. 27.

In coming to this determination, he considered her symptoms, and first looked to

see whether her impairments could reasonably be expected to produce her pain or

symptoms. Second, he evaluated the intensity, persistence, and limiting effects of the

symptoms, making a credibility determination based on the record, whenever Plaintiff's

symptoms were not substantiated by objective medical evidence. R. 27.

Plaintiff alleged inability to work based on cervical/shoulder pain, muscle pain,

numbness in her extremities, and depression, and the ALJ found that "the evidence

establishes the existence of medically determinable impairments that could reasonably

have been expected to result in the types of symptoms the [Plaintiff] reports but the

record through December 2012 did not support the degree of limitations she alleged." R.

27.

The ALJ came to this conclusion based partially on Plaintiff's activities of daily

living: she cooked, cleaned, shopped for food, washed clothes, took care of her four and

six year old children—helping them bathe and do homework—she could lift 20 pounds,

sit for 20-30 minutes, walk for half a mile, and socialized with other couples. R 27-28.

The ALJ found that the results from examinations and progress notes showed

musculoskeletal pain, nerve dysfunction, and depression, but did not support a finding of

"disabling" functional limitations. R. 28. The ALJ also reviewed the treatment records

from December 2012, when Plaintiff reported that she was able to:

> open jars, write legibly, turn a doorknob, put on socks, climb stairs
> and reach overhead and into her back pocket. The examination
> showed grossly normal deep tendon reflexes. . . no joint tenderness
> and a normal examination of the DIP, PIP and MCP joints and of
> the wrists, elbows, shoulders, hips, knees, feet and ankles (Ex.
> 13F).

R. 30. From these, the ALJ concluded that her "reported abilities are not consistent with the

degree of pain/numbness she reports, or with statements by Dr. Sheean and Dr. Gavrilyuk

regarding her physical abilities." R. 30.

In analyzing Plaintiff's mental impairment, the ALJ reviewed her records from Psycare.

R. 30. He noted that in May 2012, Plaintiff showed "a depressed mood, decreased energy, loss of

interest in activities, some memory problems, mood swings and difficulty making plans for the

future." She was diagnosed with a mood disorder and assigned a GAF of 55-60, which was

consistent with moderate symptoms. R. 30.

The ALJ found that Plaintiff's medical records "confirm some cervical abnormalities that

warrant significant limitations in lifting, carrying and feeling," but that they did "not establish

abnormalities in the claimant's lower extremities and the documented improvement in her

condition with treatment does not support the functional limitations she alleges." R. 30.

While Dr. Gavrilyuk consistently labeled Plaintiff's symptoms as signs of disability, the

ALJ found that:

> the objective findings from multiple physical examinations of good muscle strength, a lack of joint tenderness and a full cervical range of motion do not support this conclusion or the [Plaintiff's] reported problems with walking, standing and sitting. The Claimant's testimony regarding her daily activities is not consistent with "disabling" pain and fatigue as she takes care of her children's need[s], takes care of her personal needs and performs household chores.

R. 30-31. Based on the above records, the ALJ stated, "[a]fter careful consideration of the evidence, the undersigned finds that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of symptoms are not entirely credible." R. 31.

As discussed more fully *infra* p. 26, the ALJ gave "little weight to the opinion of the DDS medical consultant at the initial level of consideration that the claimant does not have any 'severe' impairments and to the opinion of the consultant at the reconsideration level that the claimant does not have a 'severe' mental impairment." R. 31 (citing R. 59-60, 66-77). This was inconsistent with the record as a whole. R. 31. Moderate, but not great, weight was given to the DDS medical consultant's findings on Plaintiff's physical abilities—the medical consultant suggested that Plaintiff could lift 50 pounds occasionally, but the ALJ found that the combination of impairments restricted her to less than this. R. 31. Little weight was given to Dr. Gavrilyuk. R. 31.

Regarding RFC, the ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the longitudinal medical evidence establishing physical pain that limits the [Plaintiff's] ability to lift, carry and perform some postural activities and some degree of decreased sensation, which affects her ability to feel with her fingertips. Evaluation/treatment records that establish moderate limitations in

her concentration, persistence, or pace also support the residual functional capacity, which allows the claimant to perform only simple, routine and repetitive 1-2 step tasks.

R. 31.

Based on the RFC, the ALJ found Plaintiff unable to perform any past relevant work, but at age 37, Plaintiff was defined as a younger individual. R. 31. The ALJ found that she had at least a high school education, but transferability of job skills was not material because she was "not disabled," regardless of transferability. R. 32.

The ALJ asked the Vocational Expert what jobs existed in the national economy for an individual of Plaintiff's age, education, work experience, and residual functional capacity, and she testified that such light/unskilled positions that Plaintiff could do were lobby attendant (80,000 positions in the national economy), information clerk (86,000 in the national economy) and front desk attendant (60,000 in the national economy). R. 32.

### B. Treating Physician Rule

The ALJ assigned little weight to Dr. Gavrilyuk, little weight to the DDS medical consultant's opinion on severe impairments, and moderate but not great weight to the physical evaluation of the DDS medical consultant.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a) and § 416.945(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at § 404.1545(a)(1) and § 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at § 404.1545(a)(5) and § 416.945(a)(5). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3) and

§ 416.945(a)(3).[2]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2), *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) examining relationship, giving more weight to sources who have examined a Plaintiff; (2) treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based on the amount of evidence presented in support of the

---

[2] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) and § 416.929(a).

opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(c) and § 416.927(c); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.").

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to all opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).  This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

### (1) Weight Given

Here, the DDS medical consultant at the initial level of consideration found that plaintiff did not have any "severe" impairments and the consultant at the reconsideration level found no severe mental impairment. R. 31. The ALJ found this "inconsistent with the record as a whole, which documents a combination of physical impairments causing pain that warrants significant limitations in lifting and carrying and evaluation/treatment records establishing moderate limitations in the claimant's concentration, persistence or pace due to a mood disorder." R. 31.

Moderate, but not great weight was given to the DDS medical consultant on the issue of Plaintiff's physical abilities. R. 31. The ALJ found Plaintiff's chronic pain in cervical region and upper extremities to restrict her to lifting less than 50 pounds occasionally. R. 31.

Regarding Dr. Gavrilyuk, the ALJ stated:

> The claimant's treating physician, Dr. Gavrilyuk consistently found that Ms. Wedwick had signs and symptoms of "disability" but the objective findings from multiple physical examinations of good muscle strength, a lack of joint tenderness, and a full cervical range of motion do not support his conclusions or the claimant's reported problems with walking, standing and sitting.

R 30-31. The ALJ stated that Plaintiff's testimony regarding her daily activities was not consistent with "disabling" pain or fatigue that Dr. Gavrilyuk described, because she took care of the needs of her children and herself, and performed numerous household chores. R. 31. Specifically on the issue of credibility, the ALJ said:

> As discussed in detail above, the undersigned gives little weight to the opinions of Dr. Gavrilyuk regarding the claimant's ability to lift, carry, walk, stand and sit because his conclusions are not supported by the objective find9ings [sic] form [sic] examinations of a normal gait and good muscle strength.  Additionally, his finding that the claimant is "disabled" goes to the ultimate issue of disability, which is reserved to the Commissioner.

26

R. 31.

Plaintiff asserts the ALJ failed to apply the appropriate legal standards when weighing the medical opinion evidence and failed to weigh Dr. Gavrilyuk's opinion under the factors in 20 C.F.R. § 404.1527.  ECF No. 12, 17-21.

### (2) Three Challenges to the Weight Given

Plaintiff argues that the ALJ should have given controlling weight to Dr. Gavrilyuk, and gives three specific errors that the ALJ made: (1) he did not give Dr. Gavrilyuk controlling weight, as he should have; (2) even if the ALJ did not have to give Dr. Gavrilyuk controlling weight, he did not correctly weigh the six factors under in 20 CFR 404.1527 or explain how much weight he gave Dr. Gavrilyuk; and (3) after rejecting every medical opinion in the record, the ALJ inappropriately relied on his own lay interpretation of the clinical diagnostic evidence.

First, she argues that Dr. Gavrilyuk should have been given controlling weight. She cites *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting 20 C.F.R. § 404.1527) that a treating physician's opinion merits "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Plaintiff argues that the record does not support the ALJ's conclusion that Dr. Gavrilyuk based his opinions primarily on subjective complaints rather than appropriate medical findings. She argues that it was based on clinical and objective evidence: "Multiple tender points, tenderness in right interscapular area, decreased pulse in the right brachial artery, positive Adson test, a sleep study, and MRI studies." ECF No. 12, at 17 (citing R. 433-434). These findings were consistent with her medical records showing:

> positive Adson sign on the right, positive fibromyalgia tender points, tenderness in the coccyx, tenderness in the right interscalene area, decreased sensation in the left medial aspect of the forearm, decreased range of motion in the lumber spine, pain

27

radiating to the right sacroiliac area, and positive Patricks' sign on
the right.

ECF No. 12 at 17 (citing R. 429, 520, 523-24, 530). She argues that the ALJ failed to identify

other substantial evidence contradicting the opinions from Dr. Gavrilyuk, as non-examining state

agency physicians are "not enough to constitute 'substantial evidence.'" *Radford v. Colvin*, 734

F.3d 288, 295 (4th Cir. 2013).

Second, Plaintiff argues that even if Dr. Gavrilyuk did not deserve controlling weight, the

ALJ did not correctly weigh the six factors under in 20 CFR 404.1527 and explain how much

weight he actually *did* give Dr. Gavrilyuk. She emphasizes that Dr. Gavrilyuk treated her

regularly since June 2011 (R. 414), and the nature of the treatment was focused on

rheumatological and musculoskeletal impairments—the impairments at issue. Dr. Gavrilyuk

offered support for the limitations he prescribed (R. 433-34), and they were consistent with his

own records. Further, Dr. Gavrilyuk is a board certified specialist in physical medicine and

rehabilitation, which Plaintiff argues is the "most relevant type of specialist to evaluate the

combination of physical impairments at issue." ECF No. 12 at 19.

Third, Plaintiff contends that "[h]aving rejected every medical opinion in the record, the

ALJ inappropriately relied on his own lay interpretation of the clinical diagnostic evidence to

find Ms. Wedwick could perform light work activities." ECF No. 12 at 20. She cites *Trimmer v.*
*Astrue*, No. 3:10cv639, 2011 WL 4589998 *6 (E.D.Va. Sept. 7, 2011) for the point that the ALJ

cannot reach a decision simply by "splitting of the baby" between state agency physician opinion

and a treating physician's opinion, without giving a detailed explanation.

Defendant responds that the ALJ did not fail to identify substantial evidence

contradicting Dr. Gavrilyuk's opinion, and was therefore permitted to give it little weight. ECF

No. 14 at 13. The ALJ fully discussed Dr. Gavrilyuk's opinions (R. 28-29), and found substantial

evidence contradicting them. The ALJ pointed to Plaintiff's full range of cervical motion, without discomfort, and her full muscle strength, as well as his findings of normal gait and muscle strength. R. 29, 31, 378. Defendant also points to the ALJ's discussion of her testimony and activities of daily living: she cares for two children, cooks, does laundry, changes the bed linens, sweeps, vacuums, takes out the trash, unloads the dishwasher, grocery shops, and socializes with others. R. 27-28, 49-50. Further, Plaintiff reported being able to: open jars, write legibly, turn door knobs, reach overhead and into her back pocket, put on socks, climb stairs and walk long distances. R. 30, 501.

Second, Defendant argues that the ALJ considered the factors in 20 CFR 404.1527, including the record as a whole, and that an explicit discussion of every factor is not required. ECF No. 14 at 15.

Third, Defendant argues that the ALJ did not just "split the baby," because he gave a thorough analysis of the weight he gave each opinion, and did not commit the same error as the ALJ in *Trimmer*. ECF No. 14 at 16. Further, Defendant argued that "the ALJ's detailed discussion of Plaintiff's examination finding and clinical test results, coupled with his finding that Plaintiff could perform a range of light work, satisfied the mandate of SSR 98-8p."

### (3) Inadequate Analysis by the ALJ

The undersigned finds that the ALJ did not properly weigh the opinion evidence of Dr. Gavrilyuk, because he did not address the factors of 20 CFR 404.1527.

The ALJ was not required to give controlling weight to Dr. Gavrilyuk's opinion if it was inconsistent with other substantial evidence, that is with "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). Even

though the state agency opinions do not by themselves qualify as substantial evidence, *see Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013), the ALJ thoroughly discussed Plaintiff's activities of daily living and the objective medical findings. R. 27-31. Such evidence, combined with the state agency opinion, qualifies as "more than a mere scintilla," and was found to be inconsistent with Dr. Gavrilyuk's opinion. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Therefore, the ALJ had authority to deny Dr. Gavrilyuk's opinion controlling weight. *See* 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2).

The ALJ was, however, required to analyze the six factors outlined in 20 CFR 404.1527 before giving Dr. Gavrilyuk's little weight. SSR 96-2p. Even though Dr. Gavrilyuk's opinion is not controlling, it was "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* The ALJ did not address these factors, and nearly all of them weigh in favor of giving Dr. Gavrilyuk's opinion great weight.

Dr. Gavrilyuk had an examining relationship with Plaintiff, meaning he was entitled to more weight in that regard. The treatment relationship with the Plaintiff was one of regularity since June 2011, and the nature of the treatment was focused on the impairments at issue. Further, Dr. Gavrilyuk is a board certified specialist in physical medicine and rehabilitation, directly relevant to the physical impairments at issue.

The only factor against Dr. Gavrilyuk, and the only one addressed by the ALJ, was that of supportability, or the consistency with the record. The ALJ gave little weight for the same reasons he did not give controlling weight, but "more than a scintilla" of inconsistent evidence is not the same as an unsupported medical opinion. The ALJ said Dr. Gavrilyuk's "statement that [Plaintiff] had not shown signs of improvement was inconsistent with her own reports of improvement." R. 29 (citing Exhibit 2F; R. 250-326). The portions of the record that the ALJ

cites are to the records from May Medical group, from January 2006 to August 2010. While the ALJ characterized this portion of the record as "reports of improvement in her pain with treatment," they also include the following:

- July 15, 2009 - Plaintiff reported that her medications were not working well, and that she had "pain all over." R. 267

- November 20, 2009 - Plaintiff "still" had abdominal pain and bloating. R. 263.

- January 6, 2010 - Plaintiff had a low mood and affect and reported that "nothing worked" and "everything hurt." R. 262.

- March 25, 2010 - Plaintiff continued to struggle with chronic pain. R. 260.

Next, the ALJ cited various examinations which showed no joint tenderness, no trigger points, a full cervical range of motion, and stable fibromyalgia, stating that "subsequent treatment records did not document significant deterioration of [Plaintiff's] condition." R. 29. He also cited "multiple physical examinations of good muscle strength" and "normal gait" as inconsistent with Dr. Gavrilyuk's opinions. R. 30, 31. Subsequent treatment records do, however show various levels of deterioration, and decreased range of motion and muscle strength, and support for Dr. Gavrilyuk's reports:

- March 2012 - Plaintiff reported increased numbness in her hands, and showed 9/18 positive fibromyalgia tender points. R. 378.

- April 10, 2012 - Dr. Gavrilyuk found that Plaintiff met the American Rheumatological criteria for fibromyalgia, and diagnosed her with fatigue, sleep problems, and headaches. R. 433.

- April 15, 2012 - Dr. Sheean's examination showed impairment of pinprick sensation in her knees, normal joint position sense, pseudo-weakness of the great toes, and weakness in the upper limbs. R. 988-92.

- October 1, 2012 - Dr. Gavrilyuk found 10/18 positive fibromyalgia tender points, and diagnosed Plaintiff with Sjogren's syndrome and lumbar pain/right sacroiliac area pain. R. 523

- October 18, 2012 - Dr. Mahmood Pazirandeh found mildly decreased range of motion of the cervical, thoracic, and lumbar spine. R. 520.

- March 8, 2013 - Dr. Sheean found arthralgia in her knees, and "several contraindications to steroids and immunosuppression." R. 971.

- May 29, 2013 - Plaintiff reported myoclonic jerks of arms and legs, and that her symptoms were getting worse. R. 970.

- August 6, 2013 - Examination at the Naval Medical Center showed tenderness to palpation in left 2nd metacarpal and right 3rd metacarpal, strong bilateral grip, tenderness to palpation of the supraspinatus muscle, tenderness to palpation of the trapezius muscle, a muscle spasm at the trigger point of the cervical muscles, pain with cervical motion, but normal cervical spine motion, tenderness to palpation in both trochanters, and 10 out of 18 positive trigger points. R. 786.

- Plaintiff also reported numerous symptoms: sicca symptoms, vaginal dryness, cavities, painful persistent parethesias to hands and feet, joint pain, Raynauds, palpitations, myalgias with "constant knots and spasms" in muscles, chills, night sweats, migraines, disorientation, unsteady gait, vision changes, insomnia, fatigue, pruritic skin without any rash or problems with dryness, loose stools after meals, easy bruising, and depression. R. 784.

- August 19, 2013 - an examination revealed positive trigger points bilaterally in the occipital muscle, trapezius muscle, greater trochanter, second costochondral junction, lateral epicondyle, and medial knees. R. 760.

This Court does not undertake to reweigh the evidence, and the above conflict was enough to refuse controlling weight to Dr. Gavrilyuk—enough evidence that a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This does not mean, however, that Dr. Gavrilyuk's opinion was unsupported, or entirely inconsistent with the record. Nearly all of the factors from 20 CFR 404.1527 support giving great weight to Dr. Gavrilyuk, and those that are not obviously in his favor are not strongly against him. Despite this, the ALJ gave more weight to a non-examining DDS medical consultant, whose single assessment—that Plaintiff could lift 50 pounds occasionally, and frequently lift 25 pounds—was wildly inconsistent with every other evaluation in the record.

32

Even if so many factors did not weigh in favor of Dr. Gavrilyuk and against the DDS medical consultant, the ALJ must give a more thorough explanation for why so little weight was given to the treating physician. The ALJ must analyze all relevant factors under 20 CFR 404.1527, and failure to do so warrants a remand.

As for the last issue that Plaintiff raises, the undersigned finds that the ALJ did not inappropriately rely on his own lay interpretation of the clinical diagnostic evidence. While his reasons for rejecting the opinions of the treating physicians were not adequate, he did state that he gave moderate weight to the Medical Consultant. "An ALJ is not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion.' Where 'no medical opinion' supports the ALJ's RFC determination, as a 'lay person' he is 'simply not qualified to interpret raw medical data in functional terms.'" *Farrar v. Astrue*, No. 3:11cv457-JAG, 2012 WL 3113159, at *10 (E.D. Va. July 13, 2012) (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). Here, however, there was no "uncontroverted medical opinion" because the report of the state agency physician conflicted with Dr. Gavrilyuk's. The ALJ did not impermissibly "split the baby," and an ALJ is not required to "adopt an opinion in its entirety in determining a claimant's RFC." *Trimmer v. Astrue*, No. 3:10cv639, 2011 WL 4589998, at *6 (E.D. Va. Sept. 7, 2011).

**C. Mascio**

On March 18, 2015, after the initial briefs were filed in this case, the Fourth Circuit entered the decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). *Mascio* has three relevant holdings: (1) in assessing a claimant's residual functional capacity, an ALJ must conduct a function-by-function analysis; (2) hypotheticals to vocational experts must appropriately account for mental limitations; and (3) the ALJ cannot determine a claimant's RFC before assessing her credibility.

### (1) Function-by-function Analysis

The Fourth Circuit reiterated in *Mascio* that according to Social Security Ruling 96–8p:

> the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. SSR 96–8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996). "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.*

> The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at 34,478.

*Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). The Fourth Circuit did not adopt a per se rule requiring remand whenever the ALJ does not perform an explicit function-by-function analysis, but it did require enough analysis for a court to meaningfully review the ALJ's conclusions. *Id.* at 637 ("Here, the ALJ has determined what functions he believes Mascio can perform, but his opinion is sorely lacking in the analysis needed for us to review meaningfully those conclusions. In particular, although the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday.").

Defendant argues that the ALJ's analysis was adequately thorough, and does not warrant remand. Defendant's Mascio Reply, ECF No. 17 at 2-5.[3] Plaintiff responds that "the ALJ's summary of the evidence is no substitute for an explanation of how the evidence supports a claimant's ability to function at a particular level." Plaintiff's Mascio Response, ECF No. 18 at 2.

---

[3] To this end, Defendant directly argued that a function by function analysis was not required. ECF No. 14 at 16-17.

The undersigned finds the ALJ's analysis incomplete. The ALJ diligently and thoroughly discussed various aspects of Plaintiff's medical reports, and in some areas he directly applied them to her RFC, such as his finding that she could not perform jobs that more than occasionally required tactile/feeling in her fingertips. R. 27. However, on the one issue that is specifically referenced in *Mascio*—the ability to function for an entire workday—the ALJ did not do a function-by-function analysis, or explain how his RFC took account of the relevant medical records.

### (2) Hypotheticals to the VE

The Fourth Circuit also detailed in *Mascio* that hypotheticals to vocational experts must appropriately account for mental limitations. In *Mascio*, despite finding that the claimant had moderate difficulties in concentration, persistence, and pace, the ALJ's hypothetical to the VE "said nothing about [the claimant's] mental limitations." *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). The Fourth Circuit declared that "this inconsistency needs to be explained." *Id.* at 638. The VE's testimony that there were "unskilled, light work jobs" for such a person was not adequate, and the court said:

> an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." . . . . [T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace.

*Mascio*, 780 F.3d at 638.

In this case, the ALJ asked the VE to consider a person like the Plaintiff, who "[w]ould not have any frequent or constant requirements [to] exercise their tactile ability, their sense of feeling in the fingers to do their job. And finally work that would involve only simple, routine, repetitive tasks." R. 55.

As described *supra* p. 19, the ALJ eventually found that Plaintiff had no restrictions in her activities of daily living based on her mood disorder—she took care of two small children, her personal needs, performed most household chores, and had no difficulties in social functioning—but found that the mood disorder caused moderate difficulty regarding concentration, persistence, or pace. Her mood disorder "interfered with her ability to sustain concentration for the completion of complex or detailed tasks, but she retained the ability to understand, remember and carry out simple instructions and tasks." R. 26.

Plaintiff argues that the Fourth Circuit in *Mascio* rejected "exactly what the ALJ did here." ECF No. 18 at 2. That is, the hypothetical that the ALJ asked the VE only restricted her to simple, routine tasks or unskilled work. The Fourth Circuit clearly said that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio*, 780 F.3d at 638.

In response, Defendant claims that the ALJ's assessment and hypothetical were appropriate, because he determined from the medical record that Plaintiff had the ability to understand, remember, and carry out simple tasks. ECF No. 19 at 1; R. 26. As Defendant notes, in *Mascio* the RFC did not contain any limitations on the claimant's work-related mental abilities.  Here, however, the ALJ specifically found that her "moderate limitations in her concentration, persistence or pace also support the residual functional capacity, which allows the claimant to perform only simple, routine and repetitive 1-2 step tasks." R. 31. This is relevant because immediately following the portion Plaintiff cites, the Fourth Circuit specifically allowed that:

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence,

> or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

*Mascio*, 780 F.3d at 638. The defendant contends that the ALJ carefully considered Plaintiff's mood disorder, but found that such limitations were consistent with her ability to carry out simple instructions and tasks. This would therefore fall within the mentioned category of "appropriate[ly] exclude[d] from the hypothetical tendered to the vocational expert." *Id.*

The undersigned finds, however, that the ALJ did not satisfy the distinction between performing a task and staying on task. The Fourth Circuit clearly emphasized the need for determining not just the ability to do simple tasks, but the ability to stay on that task for an entire workday. *Mascio*, 780 F.3d at 637, 658 ("[A]lthough the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday. . . . [T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). Even if Defendant's argument—that a specific finding that she was capable of simple tasks satisfies *Macio*'s requirements for VE hypotheticals—is persuasive, the ALJ's opinion does not address Plaintiff's ability to stay on task for an entire day.

In fact, Plaintiff's attorney directly raised the ability to work for a full day at the hearing. Plaintiff's lawyer asked the VE, "Ms. Wedwick testified during her testimony that she requires breaks, unscheduled breaks. Sometimes she even needs to lie down as a result of her symptoms. If that requirement – and her testimony is credited, would any full time work be possible?" to which the VE responded "No." R. 56-57. While the ALJ did not find Plaintiff's complaints fully credible, he did find that her mental impairments caused limitations in concentration, persistence, and pace. As *Mascio* points out, admitting a limitation in concentration, persistence and pace

correlates to a limitation in ability to stay on task, one that the ALJ neither posed to the VE, nor included in his assessment.

### (3) Credibility Determination based on RFC

The third holding from *Mascio* covers certain boilerplate language used by the ALJ in that decision. In *Mascio*, the ALJ said:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The Fourth Circuit found this language to be inadequate, and problematic, stating "We agree with the Seventh Circuit that this boilerplate 'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" *Mascio*, 780 F.3d at 639 (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir.2012)).

In the instant case, the ALJ wrote, "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 31. The ALJ did not use the wrongful boiler plate language, and is not susceptible to challenge on such grounds.

## V. <u>RECOMMENDATION</u>

The ALJ did not accord controlling weight to the treating physician, and even if the evidence in the record qualifies as substantial evidence conflicting with Dr. Gavrilyuk's

opinions, the ALJ did not adequately justify the small amount of weight he gave the treating physician—he did not discuss the factors from 20 CFR 404.1527, almost all of which strongly support Dr. Gavrilyuk. Further, *Mascio* requires a function-by-function analysis in determining a Plaintiff's RFC, and an ALJ's finding that Plaintiff is limited in concentration, persistence, and pace, requires a corresponding finding as to whether Plaintiff has the ability to stay on task for an entire day.

This Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) and Motion to Remand (ECF No. 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 13) be DENIED, and that the decision of the Commissioner be VACATED and REMANDED

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).


_____/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE


Norfolk, Virginia
July 7, 2015